IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT NASHVILLE

APRIL SESSION, 1998

FILED

June 12, 1998

Cecil W. Crowson
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | C.C.A. NO. 01C01-9706-CR-00211 |
| | ) | |
| Appellee, | ) | |
| | ) | DAVIDSON COUNTY |
| V. | ) | |
| | ) | |
| | ) | HON. THOMAS H. SHRIVER, JUDGE |
| TILLIE RUTH STEEPLES, | ) | |
| | ) | |
| Appellant. | ) | (DELIVERY OF SCHEDULE II DRUG) |

FOR THE APPELLANT:

PETER J. STRIANSE
TUNE, ENTREKIN & WHITE, P.C.
2100 First American Center
Nashville, TN  37238

MARY A. PARKER
STEPHEN C. CROFFORD
Suite 511, Cummins Station
209 Tenth Avenue South
Nashville, TN  37203

FOR THE APPELLEE:

JOHN KNOX WALKUP
Attorney General & Reporter

ELIZABETH B. MARNEY
Assistant Attorney General
2nd Floor, Cordell Hull Building
425 Fifth Avenue North
Nashville, TN  37243

VICTOR S. JOHNSON, III
District Attorney General

TOM THURMAN
Assistant District Attorney General
Washington Square, Suite 500
222 Second Avenue North
Nashville, TN  37201-1649

OPINION FILED _____

AFFIRMED

THOMAS T. WOODALL, JUDGE

# OPINION

The Defendant, Tillie Ruth Steeples, appeals as of right the six-year sentence imposed by the Davidson County Criminal Court following her sentencing hearing. After a careful review of the record, we affirm the judgment of the trial court.

Defendant was indicted on four counts of cocaine-related charges pertaining to incidents occurring on July 26, 1994 and August 10, 1994. Count One charged Defendant with delivery of .5 grams or more of cocaine, and Count Two charged her with causing a Schedule II drug to be taken or sent into a detention facility where prisoners are quartered. Count Three charged Defendant with taking or sending a Schedule II drug into a detention facility on August 10, 1994, and Count Four charged Defendant with the death of her incarcerated husband, Thomas Steeples, resulting from the unlawful distribution of cocaine. On November 14, 1996, Defendant entered a *nolo contendere* plea to Counts One and Two. Consistent with the plea agreement, Counts Three and Four dealing with the August 10, 1994, event were dismissed. Nonetheless, Defendant denied guilt as to all four Counts against her at the sentencing hearing. Following the two-day sentencing hearing, the trial court sentenced Defendant to serve the agreed-upon six-year sentence relating to Counts One and Two, and denied Defendant's request that she be given some type of alternative sentencing.

It is first necessary to describe the nature of the circumstances surrounding all four Counts against Defendant since the facts pertaining to all four Counts were brought out at the sentencing hearing. Despite the fact that Counts Three and Four were dismissed, the trial court allowed the State to offer evidence on those counts

as that evidence pertained to Defendant's character. Counts One and Two relate to the July 26, 1994 incident in which Defendant purchased cocaine from a known drug dealer, placed it in an envelope where it was then taped to business papers, and had the papers and cocaine delivered to her husband in jail by her husband's lawyer. The State's theory relating to Counts Three and Four involves Defendant directing her employee, Donna Esstman, to purchase a sweatsuit and other clothing items for Defendant's husband. Defendant then placed cocaine inside part of a latex glove and put that latex piece inside a mended place in the waist band of the sweatpants. On August 10, 1994, she sent the clothing package to Michael Evans, an inmate in the same jail where Defendant's husband was incarcerated. As a result of this last delivery of cocaine, Defendant's husband overdosed on the cocaine and died. The State's theory involved showing that Defendant had used a sewing machine to restitch the sweatpants containing the cocaine and conspired to destroy or cover up that and other evidence of criminal activity.

On November 14, 1996, at a hearing on Defendant's plea of *nolo contendere* to Counts One and Two, the following facts were established by the State. Sometime prior to May 19, 1994, Defendant's husband was arrested and charged with three counts of first-degree murder, especially aggravated rape, and various drug charges. Prior to July 26, 1994, Defendant told employees of her company that her husband would never go to trial. She told Dr. Kellum, her son's school principal, that her husband was going to commit suicide and that she would receive a large insurance settlement. On July 26, 1994, there was a $580,000 life insurance policy in effect for Mr. Steeples.

Also prior to July 26, 1994, Defendant asked an employee, Don Vanloon, how much cocaine it would take to kill a person. On July 25, 1994, Defendant cashed a $1,000 check and met with Fred Ross, a known drug dealer, at a local motel. On July 26, 1994, Mr. Vanloon was working at Defendant's place of business when Defendant left to meet with her lawyer, Mark McDougal. Defendant's husband called the place of business and told Mr. Vanloon to tell Defendant not to leave a certain package alone with Mark McDougal. On July 26, 1994, Defendant drove Mr. McDougal to the jail where Defendant's husband was incarcerated. Defendant gave Mr. McDougal a package containing some business papers to take to her husband. Even though Mr. McDougal had taken business papers to the jail by himself before, on this occasion Defendant insisted that she accompany Mr. McDougal to the jail. Mr. McDougal went in the jail and delivered the package to Mr. Steeples. Normally, Mr. Steeples would have had a conversation with Mr. McDougal, but this time Mr. Steeples took the package, got a cold drink, and returned to his cell. Upon returning to his cell, Mr. Steeples was stopped and searched by two guards who discovered cigarettes taped in an envelope. Mr. Steeples grabbed the envelope from one of the guards and started to eat the envelope that contained white powder. After he had consumed some of the white powder in the envelope, Mr. Steeples was taken to a hospital for treatment. The white powder in the envelope was cocaine. Defendant's fingerprints were lifted from inside a piece of tape used to attach the envelope containing cocaine to the business papers.

Based on the foregoing facts, Defendant pled no contest to Counts One and Two in exchange for a sentence of three years on each count, to be served consecutively for a total of six years. Counts Three and Four were dismissed.

Defendant's sentencing hearing was conducted over two days in January, 1997. Twice during the sentencing hearing, the trial court asked defense counsel if Defendant would like to withdraw her plea. Both times, defense counsel talked privately with Defendant, and both times defense counsel stated that Defendant wanted to proceed with her plea. The trial court warned Defendant that any untruthfulness at the hearing would affect her sentence. Defendant and eighteen other witnesses testified regarding the July and August 1994 events.

Evidence at Defendant's sentencing hearing revealed that after her husband's arrest on the murder, rape and drug charges, Defendant wrote a letter dated April 29, 1994, to Dr. Danny Kellum, the principal of a private school that had expelled her son, stating that "half the time we don't even know where he [Mr. Steeples] is" but then praised her husband as "a wonderful man" who "deserves the respect of the faculty, staff, student body, and community." She originally included a check for $75,000 in the letter for the school's new library and wanted to name the library in honor of her husband. However, she tore up the check when the school expelled her son.

On May 19, 1994, while Mr. Steeples was incarcerated, Defendant testified at her husband's bond hearing, which was held before the same judge who presided over Defendant's sentencing hearing. From the record, it appears that Defendant's testimony at the bond hearing focused on her unwavering support of her husband's release on bond to get treatment for cocaine use, that she was not considering divorce, and that she alleged that he abused her in a prior divorce filing because "angry wives do a lot of things." She testified at the bond hearing that, except for

one occasion, she had always known her husband's whereabouts when he was not at home.

Defendant testified at the sentencing hearing that she did not recall a meeting with the drug dealer Fred Ross. Defendant testified that she knew a "Fred" who owed her husband a lot of money and that she contacted this "Fred" to raise money for her husband's lawyers. Defendant testified that she did not recall why she wrote a $1000 check for cash on July 25, 1994, the day before Defendant's husband ingested cocaine the first time. Defendant testified that she did not recall a conversation on April 6, 1995 with Donna Esstman in which she stated she had told investigating authorities she did not know Fred Ross. The State's attorney read the following from a recording of an April 6, 1995 conversation between Ms. Esstman and Defendant:

(Defendant): "When they showed me this picture of Fred, I just flat out told them that I had never seen this person before in my life. I don't recognize him at all."

(Esstman): "Do they know who he is?"

(Defendant): "They know who he is; but, they can't get any evidence on him."

Defendant testified at her sentencing hearing that she did not recall that conversation.

When questioned about a recording of a conversation that she had with Ms. Esstman on April 3, 1995, Defendant denied that the recording revealed that she was encouraging Ms. Esstman "to deny everything" to the authorities. Defendant testified that what she was encouraging Ms. Esstman to deny was "a whole lot of stuff that she's got built up in her head. . . She has a lot of emotional problems."

Defendant testified that the sewing machine that they discussed on the tape had belonged to an ex-employee and was taken from the office by Ms. Esstman. Defendant testified that she did not know anything about sewing done on the sweat pants that were delivered in August 1994 to her husband in jail. She further denied using the sewing machine "for any criminal intent." Defendant testified that the sweatsuit, socks and underwear she sent Ms. Esstman to purchase were for her son and not for her husband.

Defendant testified that her fingerprints were on the tape attaching the envelope containing cocaine to the business papers because she had wrapped the tape around a pencil so that her husband could repair his broken glasses. Defendant testified that she did not know who put drugs in that package delivered to her husband on July 26, 1994. She testified that she drove Mr. McDougal to the jail because it was raining hard that day. She further testified that the only reason her husband left her a message not to leave the package with Mr. McDougal was out of concern that he might not deliver it immediately.

The trial court questioned Defendant about her statement in the pre-sentence report charging that Detectives Pridemore and Postiglione, who were investigating the charges against her husband, had threatened her with destruction of her business. Specifically, she stated in the pre-sentence report as follows:

> I pled 'no contest.' My greatest crime was being married to Tom Steeples. When he died before going to trial, the system wanted blood and could find it by pursuing me and the business. The 2 detectives vowed they would destroy both me and my business. They have! They stood in front of my business and swore I would be the next notch on their belt. I was! They said no one would do business with someone accused of murder whether convicted or not. They were right! They bragged about bringing down

> a large BP Station and said I would be next. I was! My husband was not searched before he came down. He brought a large 9 x 12 white envelope down with him. It contained the drugs I was accused of sending in to him.

At the sentencing hearing, Defendant stated that this was her "scenario" of the charges against her. Defendant testified further that the officers had, in fact, threatened to destroy her business.

Detective Postiglione testified that after Defendant's husband became a suspect, that he and Detective Pridemore went to Defendant's place of business to try to speak to her because her husband had disappeared and officers were unable to locate him. When the detectives attempted to speak with Defendant in front of her place of business, she was hostile and refused to speak to Detective Postiglione. She eventually became verbally abusive to both officers. According to Postiglione, neither he nor Pridemore threatened Defendant with destroying either her or her business.

Michael Evans, a fellow inmate of Mr. Steeples, testified that on August 10, 1994, he received a package containing underwear, socks, and a sweatsuit that was delivered to the jail after he had spoken to Defendant on the phone. After Mr. Evans received the package, he told Mr. Steeples where the package was and left to take a shower. About two and a half hours later, Mr. Steeples was found dead from a cocaine overdose.

Ms. Esstman testified that Defendant stated repeatedly that her husband would never go to trial. Prior to Mr. Steeples' death, Defendant asked Ms. Esstman to purchase a white two-piece sweatsuit, some white tube socks and some mens underwear. Defendant told Ms. Esstman that these items were to be sent to Mr. Steeples as a care package.

Before Mr. Steeples' death, Ms. Esstman went with Defendant to meet an individual named Fred at the Days Inn on Trinity Lane. Prior to this meeting, Defendant and Ms. Esstman had gone to a NationsBank where Defendant cashed a check. Around the time that these events were taking place, Ms. Esstman estimated that Defendant received more than a dozen phone calls at work from a person named Fred.

Ms. Esstman further testified that on the day of Mr. Steeples' death, Defendant received a phone call from her husband that morning. After the phone call, Defendant seemed distraught and emotional. After Defendant was notified of her husband's death, she told Ms. Esstman that it was over and that she had done what her husband had wanted her to do.

Shortly after her husband's death, Defendant delivered a sewing machine to Ms. Esstman and asked her to keep it in the trunk of her car. Eventually Ms. Esstman called the police and turned the sewing machine over to them. Ms. Esstman testified that she soon began cooperating with the authorities in their attempt to get tapes to corroborate the meetings with Fred, the purchase of the clothes, and the matter of the sewing machine.

John Lowery, a pressman who had worked for Defendant, testified that on April 6, 1995, Defendant asked him and another employee to go to Ms. Esstman's house to get a sewing machine. At that time Mr. Lowery was aware that the police already had the sewing machine and that Ms. Esstman was cooperating with the police. Mr. Lowery told the authorities that Defendant was planning to destroy or hide evidence. Defendant testified that she did not recall telling Mr. Lowery to get the sewing machine from Ms. Esstman.

Detective Postiglione testified that a pair of cotton sweatpants, some mens underwear, and white tube socks were found in Mr. Steeples' jail cell after his death. He testified that no cocaine residue was found on the clothes but that the sweatpants had a rip in the area where the string would normally be tied and that a piece of latex glove was found close to Mr. Steeples' body.

Defendant offered proof that she has no prior arrest record or prior convictions. She also testified that she has worked her entire adult life. She has owned her own business for twenty years. Defendant resides with her two children in Mt. Juliet, Tennessee. Defendant offered proof that she participates in school activities with her sixteen year old son, including football games and fundraisers for the school and the football team. Defendant served on committees at her daughter's school as well. A former teacher of her son testified that Defendant never acted inappropriately or contrary to the best interest of the children. The teacher also testified that it would be devastating if the son lost another parent.

Defendant testified at length about the physical abuse she suffered from her husband. She testified that her husband had broken many of her bones in the past

and that many of the beatings occurred in front of her children. She said that her children had to call the police on several occasions. Defendant testified that her husband told her if she didn't stay with him that he would kill the children in front of her, and that he would then kill her. After her husband was incarcerated, Defendant said that he continued to call her and threaten the children if she did not accept his phone calls.

Dr. Scott Fairchild, a licensed clinical psychologist, testified on behalf of the defense. After pleading *nolo contendere*, Defendant sought counseling from him on three occasions. Dr. Fairchild testified that people who get into abusive relationships tend to repeat them and that he was not surprised that Defendant had tried to help her abusive husband get out of jail on bond. He went on to say that he believes that if the Defendant is not allowed treatment then she could again be involved in criminal activity.

Her son, John Steeples, testified that he had seen his father abuse Defendant. He recalled one incident when he stepped in between his mom and dad to break up the fight. He said that he had called the police to prevent the abuse on other occasions.

The pastor of Defendant's church testified that a strong bond exists between Defendant and her children. He said that Defendant was devoted to her children and that he had seen no evidence that Defendant would be a threat to other members of society. The church administrative assistant also testified and said that Defendant did attend church and that she had never seen Defendant engaged in any criminal behavior.

A longtime friend of Defendant, Ellis Green, testified that he had known Defendant since 1974. He said that he had never seen Defendant try to hurt anyone either physically or emotionally. He further said that the public would be safe if Defendant was put on probation.

Defendant's bankruptcy attorney testified that Defendant's company was viable as of 1994. However, after her husband was incarcerated in 1994, the company began to falter. Defendant put in $500,000 to try and save the company, but it still failed. Defendant used her husband's life insurance proceeds to try and save the business, but she eventually had to file for bankruptcy.

Because the State and Defendant agreed upon the length and consecutive nature of the sentences, Defendant's only issue in this appeal is the manner of service of the six-year sentence. A defendant who "is an especially mitigated or standard offender convicted of a Class C, D or E felony is presumed to be a favorable candidate for alternative sentencing options in the absence of evidence to the contrary." Tenn. Code Ann. § 40-35-102(6). Our sentencing law also provides that "convicted felons committing the most severe offenses, possessing criminal histories evincing a clear disregard for the laws and morals of society, and evincing failure of past efforts at rehabilitation shall be given first priority regarding sentencing involving incarceration." Tenn. Code Ann. § 40-35-102(5). Thus, a defendant sentenced to eight years or less who is not an offender for whom incarceration is a priority is presumed eligible for alternative sentencing unless sufficient evidence rebuts the presumption. However, the Act does not provide that all offenders who meet the criteria are entitled to such relief; rather, it requires that sentencing issues

be determined by the facts and circumstances presented in each case. <u>See</u> <u>State v. Taylor</u>, 744 S.W.2d 919, 922 (Tenn. Crim. App. 1987).

Additionally, the principles of sentencing reflect that the sentence should be no greater than that deserved for the offense committed and should be the least severe measure necessary to achieve the purposes for which the sentence is imposed. Tenn. Code Ann. § 40-35-103(3)-(4). The court should also consider the potential for rehabilitation or treatment of the defendant in determining the sentence alternative. Tenn. Code Ann. § 40-35-103(5).

When imposing a sentence of total confinement, our Criminal Sentencing Reform Act requires the trial court to base its decision on the considerations set forth in Tennessee Code Annotated section 40-35-103. These considerations which militate against alternative sentencing include: the need to protect society by restraining a defendant having a long history of criminal conduct, whether confinement is particularly appropriate to effectively deter others likely to commit a similar offense, the need to avoid depreciating the seriousness of the offense, and the need to order confinement in cases in which less restrictive measures have often or recently been unsuccessfully applied to the defendant. Tenn. Code Ann. § 40-35-103(1).

In determining whether to grant probation, the judge must consider the nature and circumstances of the offense, the defendant's criminal record, her background and social history, her present condition, including her physical and mental condition, the deterrent effect on other criminal activity, and the likelihood that probation is in the best interests of both the public and the defendant. <u>Stiller v. State</u>, 516 S.W.2d

617, 620 (1974). The burden is on the Defendant to show that the sentence she received is improper and that she is entitled to probation. State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). Grants or denials for probation and other types of alternative sentencing are reviewed *de novo* with a presumption of correctness. Tenn. Code Ann. § 40-35-401(d); State v. Byrd, 861 S.W.2d 377 (Tenn. Crim. App. 1993). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." Ashby, 823 S.W.2d at 169.

In the instant case, the trial court determined that regardless of Defendant's persistent denial of guilt, there was a factual basis for finding guilt. Further, the trial court recited numerous incidences where Defendant's sworn testimony was not truthful. Finally, the trial court observed that, in light of the severity of the charges against her, Defendant was given considerable lenience in the plea agreement. After considering all of the foregoing, the trial court concluded that Defendant should spend her six-year sentence incarcerated in order to deter others from smuggling drugs into prisons, to avoid depreciating the seriousness of the offense, and to avoid inequities in sentencing. After a careful review of the record, we find that the trial court properly considered the sentencing principles, and therefore, our review will be *de novo* with a presumption of correctness.

The Defendant's two convictions are Class C felonies. See Tenn. Code Ann. §§ 39-11-403; 39-16-201(b). She was sentenced as a Range I Standard Offender to three years for each count. There is a statutory presumption that the Defendant is eligible for probation as to these convictions. See Tenn. Code Ann. § 40-35-102(6). However, the trial court denied her request for probation on these counts.

We agree with the trial court that Defendant should not be granted probation for her convictions on Counts One and Two. Defendant does have an excellent work history and social history. She has never been convicted of another crime. However, we must emphasize the seriousness of this crime. Defendant illegally sent cocaine to her husband in prison, apparently with the intentions of allowing her husband to overdose on the drug so he would not have to stand trial. Also, since her husband's insurance policy apparently did not have a "suicide clause," Defendant was able to collect more than a half million dollars as a result of her husband's death. The circumstances of an offense may be an appropriate factor for the denial of probation. State v. Wiseman, 643 S.W.2d 354 (Tenn. Crim. App. 1982). We conclude that the circumstances of this offense alone are likely enough to support the denial of probation.

Untruthfulness or lack of candor may also be an appropriate consideration to deny probation because it reflects poorly upon a defendant's potential for rehabilitation. State v. Bunch, 646 S.W.2d 158 (Tenn. 1993). Defendant did not accept blame for any of her actions, even in the face of overwhelming evidence that she did in fact commit the offenses. For example, Defendant's denial that she knew her husband was planning to commit suicide was not credible based on the evidence. The record showed that Defendant had told several people that her husband would never go to trial and that when she learned of his death, she stated "I'm free." Defendant's testimony regarding her helplessness in the face of her husband's abuse was also unconvincing to the trial court. As the trial judge pointed out, Defendant was extremely supportive of her husband at his bond hearing and her demeanor at that hearing was "imperious, belligerent, defensive and hostile." The court determined that the hostility Defendant exhibited at the bond hearing and the

statements praising her husband in her letter to Dr. Kellum undermined and belied her insistence at the sentencing hearing that she was a helpless victim of her husband's abuse. Defendant even wanted to give money to her son's school for a new library, and wished to name it in honor of her husband.

Defendant's testimony that she did not recall the meeting with the drug dealer, Fred Ross, was also unconvincing. The testimony of Donna Esstman and the transcript of the April 6, 1995 conversation completely contradict Defendant's story. The court concluded that the evidence showed that the meeting did in fact take place, and as a result of that meeting, Defendant purchased cocaine that was later sent to her husband in prison. Also, Defendant's explanation of her advice to Ms. Esstman that "you can . . . strictly deny everything if you want to" meant that she was urging Mrs. Esstman to confront her psychological problems is likewise unconvincing. Furthermore, Defendant's insistence that she knew nothing about the sewing machine or any attempt to hide it from authorities is contradicted by the testimony of Ms. Esstman and John Lowery whose testimony regarding Defendant's efforts to hide evidence was absolutely consistent with one another. All of the foregoing facts point to Defendant's lack of candor with the trial court as well as her untruthfulness.

Defendant claims that the State introduced no evidence at her sentencing hearing regarding the July 26, 1994 incident. In fact, the testimony focusing on the cocaine purchase from Fred Ross, the delivery of cocaine to the jail by her lawyer, the discovery of cocaine in the envelope, and the discovery of Defendant's fingerprints on the tape all dealt with the July 26, 1994 incident.

We disagree also with Defendant's contention that only an alternative sentence "with continued treatment and therapy" can benefit her. The record just does not support Defendant's claim that she is actively or genuinely seeking treatment or rehabilitation since she did not visit a psychologist until after she had entered her *nolo contendere* plea.

Likewise, we also disagree with Defendant's contention that the trial court denied her probation by imposing an extra-statutory requirement for granting probation. Specifically, Defendant argues that the trial court, in essence, made a defendant who enters a *nolo contendere* plea presumptively ineligible for alternative sentencing. However, the record does not support Defendant's assertion. As previously discussed, Defendant was consistently evasive and untruthful in her testimony. Defendant was also unrepentant and showed contempt for the proceeding in which she testified. These are all ample reasons for determining that Defendant was unsuitable for alternative sentencing. See State v. Dykes, 803 S.W.2d 250 (Tenn. Crim. App. 1990).

Defendant also requests that her case be remanded to permit her to withdraw her *nolo contendere* plea and allow her a jury trial. However, the trial court asked the Defendant two times during the sentencing hearing if she would like to withdraw her plea. After discussion with her counsel both times, she expressed her decision to proceed with the sentencing hearing and with her plea of *nolo contendere*. Obviously, Defendant did not seek the relief which she is now asking at the trial court and we are precluded from entertaining that request absent plain error. See State v. McClintock, 732 S.W.2d 268 (Tenn. 1987). Defendant's attempt to seek relief beyond the issue presented in her notice of appeal, the denial of probation or other

form of alternative sentence, cannot now be entertained.  See id.; see also Tenn. R. Crim. P. 37(b).

In summary, Defendant's overall demeanor, including her insistence on blaming other people and her lack of candor and truthfulness to the court, all militate against any type of alternative sentence.

Accordingly, we affirm the judgment of the trial court.


_____
THOMAS T. WOODALL, Judge


CONCUR:


_____
GARY R. WADE, Presiding Judge


_____
L. T. LAFFERTY, Special Judge